IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| EDMUND F. TUREK TRUST IMA, | : | Case No. 1:18-cv-739 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| PNC BANK, National Association | : | |
| d/b/a/ PNC WEALTH MANAGEMENT, | : | |
| | : | |
| Defendant. | : | |

ORDER GRANTING DEFENDANT PNC BANK'S MOTION FOR JUDGMENT ON
THE PLEADINGS (Doc. 11)

This matter is before the Court on the Motion for Judgment on the Pleadings submitted by Defendant PNC Bank, National Association d/b/a PNC Wealth Management ("PNC"). (Doc. 11.) Mr. Edmund Turek ("Turek") is the trustee of the Edmund F. Turek Trust IMA ("Plaintiff"). Plaintiff filed this lawsuit under a variety of legal theories following some unsuccessful investments. PNC has moved for judgment on the pleadings under Fed. R. Civ. P. 12(c).

BACKGROUND

After Edmund Turek's wife was diagnosed with Alzheimer's, he needed more income to pay for her care. So, in March 2011, he sought PNC's investment services. He and PNC entered into an Investment Management Agreement (the "Original Agreement"). The Original Agreement was amended in October 2014 (the "Amended Agreement"). (Doc. 5 at ¶¶ 2, 5.) Turek opened an account with PNC in May 2011 (the

1

"Account"). Upon its opening, the Account had a value of $2,244,914.11. Turek deposited $280,000 in additional securities. Thus, by January 1, 2012, the Account had a total deposited value of $2,524,914.11. (*Id.* at ¶ 6.)

Turek advised PNC that his sole investment objective was to achieve maximum income in the short term, as opposed to growth, while maintaining market value. The parties memorialized this understanding through an Investment Policy Statement ("IPS" or "IPSs"). (*Id.* at ¶ 7.) Plaintiff claims that, despite Turek's stated goals, PNC invested most of the Account's funds in a portfolio highly concentrated in equities. The entire time the Account existed, at least 75% of its funds were placed in equities. In 2013 and 2014, however, equities comprised over 96% of the Account. According to Plaintiff, this approach was inconsistent with Turek's needs and objectives. (*Id.* at ¶ 8.)

In 2014 and 2015, the Account sustained significant losses. Some stocks were in companies that had filed for bankruptcy, though Plaintiff does not identify which companies. Plaintiff does, however, identity some unsuccessful investments. PNC purchased $280,397 worth of Seadrill Limited shares. By the time it sold the Seadrill stock, the Account had suffered $202,489 in losses. PNC also purchased $424,200 worth of American Reality shares. Plaintiff does not say when, but by the end of 2014, those shares had lost $147,261 in value. PNC's purchase of another group of equities resulted in further loss of $234,976 in value. All told, the total losses exceed $450,000. (*Id.* at ¶ 9.)

Plaintiff claims it was improper for PNC to invest Account funds into a "highly concentrated small basket of equities," because the IPS provided that a maximum of 75% of Account funds would be invested in equities. (*Id.* at ¶ 12.) It does not say how much

2

of the funds were invested in equities, except for the one reference to the equity-allocation reaching 96% of the portfolio in 2013 and 2014. (*Id.* at ¶ 8.)

Plaintiff also claims that multiple brokers worked on the Account over the course of time, without any idea of the stated investment objectives. (*Id.* at ¶ 10.) Finally, Plaintiff claims that PNC charged more than $100,000 in management fees, all the while making poor investment decisions. (*Id.* at ¶ 14.)

Now before the Court is PNC's motion for judgment on the pleadings. *See* Fed.R.Civ.P. 12(c).

## DISCUSSION

The standard of review for a Rule 12(c) motion for judgment on the pleadings is the same as for a motion under Rule 12(b)(6) for failure to state a claim. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). The Court construes the complaint in the light most favorable to the plaintiff, accepts all allegations as true, and draws all reasonable inferences in the plaintiff's favor. *Coley v. Lucas County*, 799 F.3d 530, 537 (6th Cir. 2015). "[T]he plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Fritz*, 592 F.3d at 722. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And although the Court accepts well-pleaded factual allegations as true, it need not accept "a formulaic recitation of the elements of a cause of action" or "legal conclusions couched as factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

3

A. **Applicable Law**

First, a word on the applicable law. The Complaint states that Pennsylvania law applies. (Doc. 5 at ¶ 5.) Although all well-pleaded allegations of the pleadings must be taken as true, Plaintiff's claim that Pennsylvania law applies is a legal conclusion, not a factual allegation. *See JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007). As such, the Court is not required to accept it as true. *Id.* Contract interpretation is a question of law. *Ohio, Pennsylvania & W. Virginia Coal Co. v. PanEnergy Corp.*, 120 F.3d 607, 610 (6th Cir. 1997) (citing *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del.1991)). It's true that the Original Agreement provided for Pennsylvania law. (Doc. 8-1, Ex. C, § 26.) The Amended Agreement, however, provides that Delaware law applies. (*Id.*, Ex. D, § 26(b).) It also provides that it "supersedes any other oral or written agreement between the parties." (*Id.* at § 26(c).) That would include the Original Agreement's provision for Pennsylvania law. Therefore, the Court will apply Delaware law.

B. **The Scope of the Pleadings**

Next, the Court must determine what will and will not be considered. Generally, in ruling on a motion for judgment on the pleadings, the Court primarily relies on the complaint, but may also consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint. *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (quoting *Amini v. Oberlin College*, 259 F.3d 502 (6th Cir. 2001)). Plaintiff takes issue with PNC's reliance on documents that are attached to the Answer but not to the Complaint. (Doc. 13 at 2, 7.) PNC, in turn, argues the Court should not consider the declaration attached to Plaintiff's response brief. (Doc. 14 at 3-4.) For the

4

most part, they are both right.

*Exhibits attached to the Answer.* Exhibits C and D to the Answer are simply the Original and Amended Agreements which were also attached to the Complaint. The Court will consider those. *Barany-Snyder*, 539 F.3d at 332. Exhibit H contains Investment Policy Statements, also attached to the Complaint. The Court will consider those, too. Exhibit H contains an additional IPS, from 2015, that Plaintiff did not include. The Court will consider Exhibit H in its entirety because the Complaint refers to Investment Policy Statements and they are central to the claim. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001).

As for the rest of PNC's exhibits, the Court must determine whether they constitute "pleadings" or are otherwise adopted as pleadings. An answer is a pleading. Fed. R. Civ. P. 7(a). A written instrument attached as an exhibit to a pleading is a part of that pleading for all purposes. Fed. R. Civ. P. 10(c). Therefore, a written instrument attached to an answer is part of the pleadings. *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007). But the words "written instrument" mean something, *see Freeland v. Liberty Mut. Fire Ins. Co.*, 632 F.3d 250, 253 (6th Cir. 2011), and circumscribe which exhibits may constitute parts of the pleading. An "instrument" is, among other things, a "written legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate." *Instrument*, BLACK'S LAW DICTIONARY (11th ed. 2019).

The only items attached to the Answer that fit that definition were already attached to the Complaint. The rest of PNC's exhibits are correspondence between PNC

and Turek in Exhibits B, G, K, L, M, N, R, and S; a memorandum in Exhibit J; investment program summaries in Exhibits O, P, Q; and miscellaneous lists in Exhibits A (transaction listing), E (account activity notes), F (performance master list), and I (list of meetings). None of these are written instruments. The Court will therefore exclude them from its consideration.

*Turek's declaration.* Plaintiff attaches a declaration by Turek to its response in opposition to PNC's motion for judgment on the pleadings. However, it concedes that the Court may consider exhibits attached to a motion for a judgment on the pleadings "so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Plaintiff attached the declaration to a response brief, not a motion, and the Complaint does not refer to it. It raises new facts not in the Complaint. It is not a public record or otherwise appropriate for judicial notice. *See* Fed. R. Evid. 201(b). Therefore, upon consideration, Turek's declaration is not a part of the pleadings and the Court will not consider it.

### C. The Contract and Fiduciary Breach Claims

Plaintiff claims that PNC breached both the contract and its fiduciary duty by failing to follow the IPS and failing to make sound investments. (Doc. 5 at ¶¶ 17, 23.) So, based on the pleadings, PNC's breaches resulted from the same set of facts: failure to follow the operative IPS. Furthermore, Plaintiff does not distinguish between the contract and fiduciary claims in its brief in opposition to the motion for judgment on the pleadings. Both claims, then, hinge on what PNC was required to do under the IPSs.

Both the Amended Agreement and the IPSs limit PNC's liability except for gross

6

negligence and willful misconduct. The Amended Agreement provides that the Investment Manager "will not be liable for (i) any loss, damage, or liability incurred by Client unless it results directly from the Investment Manager's gross negligence or willful misconduct." (Doc. 8-1, Ex. D, § 16.) The IPSs adopt the same standard by reference. Each of the IPSs indicate that it is "subject to the terms and conditions, *including the standard of care and any limitations of liability*, of the documents, which constitute the governing instruments for the applicable account." (Doc. 8-1, Ex. H, PAGEID 200, 204, 208, 212, 216, emphasis added.)

Such limitations of liability have force under Delaware law. Delaware holds to the strong presumption that parties have the freedom of contract and that their contracts should not be invalidated easily. *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 172 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006). This principle extends to limits on liability. "With respect to limitations on contractual liability, freedom of contract would suggest that parties to a contract should be entitled to draft agreements so as to avoid certain of the duties and liabilities that are normally part of a contractual relationship." *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, No. CV 7471-VCP, 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013). In similar limitation-of-liability clauses, Delaware courts have treated gross negligence and willful misconduct as sufficiently comparable to both be distinguished from simple negligence. *See Cont'l Fin. Co., LLC v. TD Bank, N.A.*, No. CVN17C07002MMJCCLD, 2018 WL 565305, at *2 (Del. Super. Ct. Jan. 24, 2018). Therefore, the Court will give effect to the parties' agreed-upon limitation of liability to those situations amounting to willful misconduct or gross negligence.

7

Gross negligence means something other than negligence. *Guttman v. Huang*, 823 A.2d 492, 507 fn. 39 (Del. Ch. 2003). Gross negligence has a "stringent meaning" which involves a "devil-may-care attitude or indifference to duty amounting to recklessness." *Gelfman v. Weeden Inv'rs, L.P.*, 859 A.2d 89, 114 (Del. Ch. 2004). *See also McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) ("Delaware's current understanding of gross negligence is conduct that constitutes reckless indifference or actions that are without the bounds of reason."). The Supreme Court of Delaware has acknowledged that "[t]he burden to plead gross negligence is a difficult one . . . ." *Espinoza on behalf of JPMorgan Chase & Co. v. Dimon*, 124 A.3d 33, 36 (Del. 2015). "In order for a plaintiff to plead gross negligence with the requisite particularity, the plaintiff must articulate 'facts that suggest a wide disparity between the process . . . used . . . and that which would have been rational.'" *J.L. v. Barnes*, 33 A.3d 902, 916 fn. 77 (Del. Super. Ct. 2011) (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 750 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)). Therefore, Plaintiff avoids judgment on the pleadings if it has sufficiently pleaded gross negligence or willful misconduct.

In PNC's view, Plaintiff has failed to sufficiently plead to the standard of gross negligence or willful misconduct. PNC points out that the Amended Agreement provides that PNC would "execute its investment management duties . . . only with [Plaintiff's] prior approval." (Doc. 12 at 3; Doc. 8-1, Ex. D, § 3(a).) PNC acknowledges its duties, but states that its duties were "subject to any investment policy statement and investment guidelines agreed to in writing by Client and the Investment Manager and in effect . . . and to Instructions . . . delivered by Client to Investment Manager . . . ." (Doc.

8

12 at 3; Doc. 8-1, Ex. D, § 3(a).) Thus, according to PNC, PNC conducted all investment activity based on Plaintiff's express ratification.

In response, Plaintiff falls back on the pleadings, claiming that it has alleged facts that amount to gross negligence: the investments were not consistent with Plaintiff's objectives, generally; Plaintiff is elderly and unsophisticated and relied on PNC for sound investment decisions; PNC had overwhelming influence over the investment decisions; PNC did not inform Plaintiff of all the risks of investment; and multiple PNC brokers worked on the Account and did not know about the objectives in the IPS. (Doc. 13 at 6.)

The allegation doing all the work in the Complaint is that both breaches resulted from PNC's failure to abide by the objectives laid out in the operative IPS. The IPS was the vehicle through which Turek advised PNC of his investment objectives. (*See* Doc. 5 at ¶¶ 7, 10, 13, 17, 23, 28, 33.) When the parties joined in 2011, Turek used the IPS to communicate that his sole investment objective was to achieve maximum income—as opposed to growth—in the short term, while maintaining market value. (Doc. 5 at ¶ 7.) The 2011 IPS corroborates Plaintiff's allegations that Turek's sole investment objective was income—not growth—and that a maximum of 75% of the Account funds would be invested in equities. (*Id.* at ¶¶ 7, 12; Doc. 8-1, Ex. H, PAGEID 198.)

Plaintiff's position boils down to an inference that investing the majority of the Account's funds in equities was fundamentally at odds with Turek's objective of maximum income (as opposed to growth) in the short term, while maintaining market value. The Court will construe that inference in Plaintiff's favor and accept it as true. But this does not resolve the Complaint's fundamental problem: its allegations are

9

contradicted by the exhibits attached to it.

"[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (quoting *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998)). "Indeed, if a factual assertion in the pleadings is inconsistent with a document attached for support, the Court is to accept the facts as stated in the attached document." *Nat'l Ass'n of Minority Contractors, Dayton Chapter v. Martinez*, 248 F. Supp. 2d 679, 681 (S.D. Ohio 2002). A review of Plaintiff's own exhibits shows that the IPSs attached to the Complaint are at odds with its material allegations.

Plaintiff's allegations flow from the first IPS executed in 2011. In fact, the 2011 IPS seems to be the only one on which Plaintiff bases its allegations. Over the course of their relationship, however, the parties executed at least four more IPSs. It's true that the first IPS stated only "Income" as the investment objective. It's also true that the recommended percentage of equities to buy was 75%. (Doc. 5-1, Ex. B, PAGEID 104.) But, according to the exhibits Plaintiff attached to the Complaint, Turek's objectives changed after 2011. The 2012 IPS states "*Growth* & Income" as its investment objective. (*Id.* at PAGEID 108, emphasis added.) Accordingly, the equity-allocation increased to 80%. (*Id.*) The 2013 and 2014 IPSs also stated "Growth & Income" as the investment objective. Consistent with that objective, the percentage of the portfolio dedicated to equities increased to 90% in 2013, then to 100% in 2014. (*Id.* at PAGEID 112, 116.) Not until 2015 did the equity-percentage decrease back to 75%. But even then, the investment objective was still for income and growth, not just income. (Doc. 8-1, Ex. H, PAGEID 214.)

The progressively-increasing equity allocations in the IPSs—all signed by Turek—are fatal to Plaintiff's breach allegations. *See Addy v. Piedmonte*, 2009 Del. Ch. LEXIS 38, 2009 WL 707641, at *6 (Del. Ch. Mar. 18, 2009) (the court need not accept "strained interpretations of fact offered by the nonmoving party"). One of the few specific factual issues Plaintiff raises is that PNC exceeded the agreed-upon percentage of the portfolio that would be dedicated to equities. (Doc. 5 at ¶ 12.) The only specific time this occurred, according to the Complaint, was in 2013 and 2014, when equities comprised over 96% of the Account. (*Id.* at ¶ 8.) The problem is that, for 2013 and 2014, Turek and PNC had agreed to invest in 90% and 100% equities, respectively—not the 75% figure Plaintiff mistakenly claims. (Doc. 5-1, Ex. B, PAGEID 112, 116.) To be sure, in 2015, the equity percentage decreased back to 75%. (Doc. 8-1, Ex. H, PAGEID 214.) But Plaintiff does not mention the 2015 IPS or plead that the percentage of equities held in 2015 had anything to do with the losses. It is therefore of no consequence that equities exceeded 75% of the Account in 2013 and 2014, because Turek had agreed to higher percentages for those years.

Here, even if Plaintiff's own exhibits did not undermine the veracity of its factual allegations, the factual content on its own does not amount to pleading gross negligence with the requisite particularity. Although Plaintiff *alleges* that PNC acted with gross negligence and willful misconduct, it is the factual content, not the recitation of a legal standard, that matters. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And the factual substance offered in support of those conclusory statements is inadequate. Plaintiff simply states that PNC invested in stocks and the value of those stocks lost value.

11

But such a risk is inherent in investing. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("Securities laws . . . do not protect investors against reverses."). Indeed, the 2014 IPS Turek signed advised that "[i]nvestments may fluctuate and suffer occasional losses." (Doc. 8-1, Ex. H, PAGEID 210.) Furthermore, the most recent IPS disclaimed that "there can be no guarantee of returns." (*Id.* at PAGEID 214.) In light of such disclaimers, simply alleging that losses occurred does not "suggest a wide disparity between the process . . . used . . . and that which would have been rational.'" *J.L. v. Barnes*, 33 A.3d 902, 916 fn. 77 (Del. Super. Ct. 2011) (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 750 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)).

Plaintiff also takes issue with PNC's investment in certain stocks, like Seadrill Limited and American Realty. (Doc. 5 at ¶¶ 9, 13.) But each of the IPSs states that there were no investment restrictions recommended, and none agreed to. (Doc. 8-1, Ex. H, PAGEID 199, 203, 207, 210, 214.) And, Turek had not restricted PNC from investing in those particular stocks.

It is against this backdrop of insufficient pleadings and contradictory exhibits that Plaintiff has failed to sufficiently allege gross negligence or willful misconduct on PNC's part. As a result, the contract and fiduciary claims must be dismissed.

**D. Other Claims**

Plaintiff raises two other counts: (1) unsuitability of recommended investments and (2) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law. Plaintiff rightfully withdraws the Pennsylvania claim in its response brief. (Doc. 13 at 11.) Since the law of Delaware, not Pennsylvania, applies, Plaintiff cannot avail itself

of Pennsylvania law. *Change Capital Partners Fund I, LLC v. Volt Elec. Sys., LLC*, No. CV N17C-05-290 RRC, 2018 WL 1635006, at *5 (Del. Super. Ct. Apr. 3, 2018). Therefore, the only remaining claim is for the alleged unsuitability of recommended investments.

But there is no such claim under Delaware law. Plaintiff cites no case law suggesting that Delaware law recognizes an independent claim of unsuitability of recommended investments. Indeed, Plaintiff now admits that the unsuitability-of-investments claim is part of the fiduciary duty claim, and asks the Court to apply a "suitability-of-advice" test to examine whether PNC provided suitable advice. Plaintiff gleans this test from an unpublished academic paper written by three Viennese scholars. But Plaintiff does not cite, and the Court has not located, any Delaware authority applying such a test. The Court declines the invitation to give Plaintiff's test its maiden voyage. Since Plaintiff admits its unsuitability claim falls under the fiduciary duty claim, the Court's judgment on that claim disposes of the unsuitability claim as well.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** PNC's Motion for Judgment on the Pleadings.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND

13